[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Procedural History
CT Page 242
This lawsuit first came to this court by writ, summons and complaint dated September 1, 1993 and filed on September 2, 1993 returnable on September 14, 1993 as of record appears.
The complaint, in one count, alleged that on September 4, 1991 the plaintiff, while working on the roof of his mother's home at 59 Pattagansett Road, East Lyme, was injured when an alleged explosion occurred on CLP pole no. 208, which pole was in close proximity to the roof on which the plaintiff was working.
The complaint claimed fair, just and adequate damages.
The defendant appeared by counsel on September 21, 1993. The defendant filed an Answer to the Complaint on November 5, 1993. The defendant filed an Amended Answer and Special Defense on August 7, 1995. The Special Defense claimed the plaintiff had failed to mitigate damages. The plaintiff filed a denial of the Special Defense on September 19, 1995. Thereafter, the pleadings were closed.
THE COURT MAKES THE FOLLOWING FINDINGS OF FACT. Raymond Brooks resides at 1 Filosi Road, East Lyme. Brooks is employed at Electric Boat on the second shift as a crane operator. He has been employed by EB for 22 years. On September 4, 1991, Brooks was at home when he heard a sound he characterized as "like dynamite going off." Brooks came out of his residence and looked around. Brooks' wife was with him, the time was between 2 and 2:30 p. m. Brooks observed people looking toward the Nelson residence. Brooks did not know what had caused the noise. Brooks wears ear plugs on his job. Brooks' residence is about 100 feet from the Nelson residence. Brooks has resided at his current residence for 18 years. Brooks had no contact with Nelson on September 4, 1991, and did not see Nelson. Brooks did not recall the events of September 4, 1991 until recently speaking with plaintiff's counsel and being summoned to court.
David A. Nelson resides at 176 Blood Street, Lyme, Connecticut. Nelson is a self employed electrical contractor and has been since 1983. On September 4, 1991, David A. Nelson was 47 years of age. Nelson is a licensed electrical contractor in Connecticut. Nelson is familiar with hook ups to CLP utility poles. At the time of the sound complained of on CT Page 243 September 4, 1991, Nelson was on the garage roof of his mother's home sweeping off leaves from the roof valley. The weather on September 4, 1991 was sunny, bright and mild. Nelson could not remember in which direction he was facing at the time of the loud noise. Nelson was not wearing any eye or ear protection on September 4, 1991 while on the roof. The noise lasted several seconds. Nelson had a preexisting condition of tinnitus. The preexisting condition of tinnitus was caused by the explosion of a fire cracker in Nelson's hand in the 1970's. Initially Nelson did not know where the sound had come from but, subsequently saw a utility truck remove a branch from wires near pole no. 5678 and Nelson observed work being done on a fuse cut out device on pole no. 208.
The distance between CLP pole no. 208 and the location where Nelson was standing is 61 feet. The distance between CLP pole no. 5678 where the branch fell and Nelson's location is 500 feet, more or less.
Nelson first sought medical treatment in March, 1993 when he visited a Dr. Wang. Nelson wore ear protection on occasion incident to his work at Electric Boat. Nelson was employed by Electric Boat in the 1970's and the setting was often times noisy. Nelson served in the military and was involved with guns, rockets and grenades. Nelson fired shoulder held rocket launchers. He made a claim for hearing loss to the Veterans Administration after military service but no evidence was presented that the V.A. acted on his claim.
Nelson owns a wide variety of weapons, some of World War I vintage and he belongs to the National Rifle Association. Nelson owns as many as 15 to 20 firearms. Nelson holds a state pistol permit. After the firecracker explosion in the late 1960's or early 1970's, Nelson never sought medical attention for hearing problems. Nelson saw a Dr. DiLisa in 1989, who conducted a hearing test. Dr. DiLisa advised Nelson that he had some hearing loss but did not prescribe a hearing aid. Nelson sought no treatment for any hearing loss in 1990, 1991 or 1992.
Dr. Natan Bauman is an audiologist who has been in practice since 1975. Dr. Bauman holds a masters degree and a PhD from Columbia University in audiology. Dr. Bauman is licensed in Connecticut. Audiology concerns itself with uses, methods and procedures to determine hearing loss. Dr. Bauman CT Page 244 has done research in the field of audiology, perception of sound, tinnitus and balance disorders. Dr. Bauman has published in his field and has taught at Columbia and Yale. Dr. Bauman has treated Nelson, the first treatment occurring in September, 1993.
When Nelson first visited Dr. Bauman, Nelson brought with him certain hearing test results which had been performed at the Veterans Administration in New Haven. Dr. Bauman found that Nelson had a hearing loss in both ears, greater in the right ear and tinnitus in the right ear. Nelson had Lyme's Disease in 1992. Nelson made the firecracker incident known to Dr. Bauman. Nelson told Dr. Bauman he had suffered from tinnitus for 20 years. Over the years Nelson's condition of tinnitus will improve according to Dr. Bauman. Dr. Bauman has seen some improvement in Nelson's hearing loss during the course of Dr. Bauman's treatment.
Nelson wears a hearing aid. Dr. Bauman conducted various tests with background noises on Nelson where Nelson scored as high as 84 percent out of a possible 100 percent. Nelson has some functional hearing deficit.
Clarence Schulte is a lead line man with CLP and has been with CLP for 11.5 years. Schulte was working on September 4, 1991 and was involved in the fuse cut out replacement on pole no. 208. A dead branch had fallen on the wires near pole no. 5678 nearby causing the fuse device to cut out the service. The fuse device was a 30k. The branch that fell was about 3 to 5 feet long and about 1 inch in diameter. The tree from which the dead branch fell is 30 to 40 feet from the power line.
Schulte has done linesman work for 23 years, he has observed fuse cut out function 50 to 100 times. A 30k fuse cut out device is not capable of making a sound 20 times louder than a shot gun blast. The 30k fuse cut out is a relatively small fuse. When a 30k fuse cut out functions to prevent fault current build up it will produce a sound equal to the discharge of a 410 shot gun (the smallest size) heard at 4 to 6 feet distant. A 30k fuse cut out going into operation is equivalent to the backfire of a car.
David Goodson is the chief Forester for CLP and is in charge of Vegetation management and directs line clearance policy. The tree trimming policy which usually is for periods CT Page 245 of four years was satisfactorily completed in September, 1991 for the subject area.
Lauren Gaunt is a Senior Engineer for CLP — Northeast Utilities. Gaunt supervises engineers relative to the electrical distribution system. Gaunt has held this post for eight years. He was previously with United Illuminating. Gaunt holds a B.A. as an electrical engineer from the University of Michigan and a masters degree from Rensallear Polytechnic Institute. He is a licensed engineer in Connecticut and has been for ten years. Gaunt has taught college level electrical engineering and belongs to numerous professional organizations in the field.
Fuse cut out devices are safety devices to prevent fault power overloads. Gaunt inspected the subject site. The fuse cut out device operated properly and as designed. The fuse cut out device did not explode. The proper operation of a fuse cut out device which involves the melting of a tin strip or fuse link to cut the current when a fault occurs is not generally a noisy event, often only a puff of smoke and a low boom.
The Law
"To constitute such casual relationship between defendant's tort and plaintiff's damage as will suffice to maintain an action of tort, the defendant's tort must have been a substantial factor in producing the damage complained of."[1]
"In the determination of what caused the loss or damage, the cause or agency which is nearest in time or place to the result is not necessarily to be chosen."[2]
"Proximate cause" is "[a]n actual cause that is a substantial factor in the resulting harm."[3]
Discussion
On September 4, 1991, a tree limb fell onto overhead conductors owned and maintained by CLP in East Lyme, Connecticut. The tree limb that fell on the overhead conductors generated fault current, and created what is commonly known as a short circuit. The fault current generated by the tree limb on the overhead conductors caused a safety device known as a "fused cut out" to operate. The fused cut CT Page 246 out that operated was located on CLP Pole No. 208 located on Upper Pattagansett Road, East Lyme, Connecticut.
The plaintiff claims that at the time the fused cut out operated, he was on the roof of his mother's house which is located near CLP Pole No. 208 on Upper Pattagansett Road in East Lyme. He claims that he was approximately 60 feet away from the fused cut out at the time and that it exploded. The plaintiff also claims that the fused cut out made a noise that was twenty times as loud as a shotgun and caused him permanent hearing damage. The plaintiff claims that his hearing damage was caused by the negligence of CLP as outlined in his complaint.
The plaintiff failed to prove that the fused cut out device located on Pole No. 208 exploded on September 4, 1991. Schulte testified that he found the door of the fused cut out in an "open" condition. He testified that this was the normal condition after a fused cut out had operated.[4] He testified that he located the tree limb on the wires on Filosi Road and removed it. Schulte further testified that he then returned to the fuse cut out device and placed a 30k fuse inside the door of the fused cut out and reclosed the fuse cut out thereby restoring power to the affected customers. Schulte testified that he observed no evidence of an explosion. He testified that he did not have to replace or repair the fused cut out device, which demonstrated that an explosion did not occur. Schulte testified that the fused cut out device had operated correctly, as a piece of safety equipment designed to protect people and property.
The noise of the cut out device was not as loud as the plaintiff claims. Schulte testified that he has heard between 50 and 100 fused cut out devices operate. He is often five or six feet away when they operate, and he has heard them with and without hearing protection. He testified that while CLP does require that he wear safety goggles, gloves and other protective equipment when replacing a fuse, he is not required to wear hearing protection. He testified that he has suffered no hearing damage as a result of hearing fused cut outs operate.
Schulte and Gaunt testified that the noise that a fused cut out device would make when it operates depends on two factors: (1) the size of the fuse placed in the fused cut out CT Page 247 device; and (2) the amount of fault current generated. Both Gaunt and Schulte testified that a 30k fuse is a relatively small fuse on the CLP distribution system and that fuses can range up to 140k. Furthermore, Gaunt testified that the maximum amount of fault current at this site was approximately 3,500 amperes which would be a relatively small amount of fault current (approximately 1/4 of the maximum amount of fault current that could be generated at other points on the distribution system). Gaunt further testified that because the cause of the fault current was a dry tree branch, which is not a good conductor of electricity, the actual amount of fault current generated that caused the fused cut out device to operate was probably far less than 3,500 amps.
Schulte testified that based on his extensive hunting experience, a fused cut out device at 5 or 6 feet, would sound like a small shotgun being fired. Schulte stated that at 60 feet the noise of a fuse could be enough to startle someone, but it could not be enough to cause hearing damage.[5]
Schulte testified that fused cut out devices are inspected as part of normal inspections that are done of CLP'S equipment. CLP had no reason to anticipate that there would be an explosion. The claims that CLP needed to take additional safety precautions to avoid an explosion, and that CLP needed to warn customers of a possible explosion are illogical and necessarily fail because the underlying premise, i.e. the fused cut out device exploded, is incorrect.
The plaintiff failed to prove that the fused cut out device was not in proper working order and failed to prove that the fused cut out device on Pole No 208 was unsafe or dangerous. The testimony of Schulte and of Gaunt was that the fused cut out is a safety device that worked exactly as intended. CLP has never had to repair that fused cut out device and that particular device continues to serve its protective function up to the present day.
The plaintiff did not offer any evidence that CLP failed to maintain this fused cut out device. Schulte testified that the fused cut out device in question appeared to be in perfect working order and that it did not need to be replaced. He further testified that the only routine maintenance would be an inspection to insure that the porcelain was not cracked and that it could operate. Schulte testified that-these CT Page 248 inspections of equipment are routinely done and that reports of these inspections are made when there is a problem. He testified that to his knowledge, there had never been a reported problem with the device located at Pole No. 208.
The plaintiff failed to identify any utility industry standards that were not complied with by CLP.
The plaintiff failed to prove that CLP failed to cut, trim or prune its trees reasonably. The plaintiff offered no credible evidence on this issue. The plaintiff did offer Exhibit P, which purported to show trees in the vicinity of CLP Pole No. 5678. The photograph was taken approximately four (4) years after the incident. Exhibit P does not demonstrate any failure by CLP to cut, trim or prune trees in the vicinity of Pole No. 5678 on September 4, 1991.
Mr. Goodson, who is the System Forester for CLP and was the designated custodian of the Tree Maintenance Records, testified that CLP has a tree-trimming program in place whereby all of its distribution lines are cleared approximately once every four (4) years. The specifications for this trimming are shown in the Northeast Utilities System Specifications for Local Distribution Line Clearance and Brush Control. (Defendant's Exhibit No. 7.) Goodson testified that based on his knowledge, and a review of CLP's tree maintenance records (Defendant's Exhibits 12, 13 and 14), regularly scheduled trimming took place in the East Lyme area between January and September of 1991. Goodson stated that there are over 3,000,000 trees in the vicinity of CLP's overhead electrical distribution wires. Even if tree trimming is done perfectly, it will still not prevent tree limbs and branches from coming into contact with overhead conductors. The fact that a tree limb contacted CLP's overhead wires on September 4, 1991 is not evidence of a failure on CLP's part to reasonably cut, trim or prune in the area of its overhead conductors. It is true that plaintiff's exhibit C, the IEEE Guide for application, operation and maintenance of high voltage fuses Section 3.5 entitled Noise Level is recited as "Vented fuses may produce intense short term noise levels during fault interruption." Plaintiff would have the court engage in conjecture and surmise as to the noise level" having presented no expert on the plaintiff's behalf such as a qualified engineer and would have the court discount the defendants evidence concerning the same. (See Plaintiff's CT Page 249 Exhibit C, photograph showing CLP Pole #5678 and nearby trees.) (See Plaintiff's Exhibit J, photograph showing CLP Pole #208 with fused cut out device thereon.)
The plaintiff suggests that the court should not be confused as concerns the testimony of Clarence Schulte and Lauren Gaunt as concerns the noise emitted when the tin strip or link melts and breaks the circuit and the sound when the fuse cut out device is reactivated when a new 30k fuse is put in place.
The court is not confused. The court, on its own, inquired of Schulte and Gaunt in order to properly understand the theory involved and the physical facts of operation of the fuse cut out. The court paid close attention to Gaunt's testimony and the diagram he drew in trying to follow what actually happens when a fault occurs. (See Defendant's Exhibit 15.) There is nothing to suggest that the defendant breached its duty to maintain the fuse cut out device in a safe working order. An examination after the event indicated the device had worked properly in all respects.
The plaintiff urges upon the court the adoption of the doctrine of res ipsa loquitur. The doctrine of res ipsa loquitur is a rule of common sense and not a rule of law which dispenses with proof of negligence. It is a convenient formula for saying that a plaintiff may, in some cases, sustain the burden of proving that the defendant was more probably negligent than not by showing how the accident occurred, without offering any evidence to show why it occurred. Conlonv. G. Fox Co., 165 Conn. 106 at 110-111 (1973); see also Gilesv. New Haven, 228 Conn. 441 (1994).
The plaintiff has not established enough evidence which, if credited, presents the defendants alleged negligence as the most plausible explanation. There are explanations logical and plausible for the plaintiff's hearing problems separate and distinct from the noise emitted by the fuse cut out device, to wit the firecracker explosion years ago, military service with heavy weapons and the fact that whatever the problem, the plaintiff neglected securing any timely, meaningful, competent medical diagnosis or treatment until after this suit was brought.
The plaintiff offered the expert testimony of Dr. Natan CT Page 250 Bauman. Dr. Bauman began treating the plaintiff on September 15, 1993, approximately two weeks after this lawsuit was filed (and two years after the incident complained of). According to Dr. Bauman, the plaintiff was referred to him by the Veterans Administration Hospital. (Defendant's Exhibit No. 8.) On the first date that Dr. Bauman treated the plaintiff, he sold to him a hearing aid for his right ear and charged him $1,600. He also performed a "tinnitus evaluation" and charged Mr. Nelson $155.00. Dr. Bauman did not perform any testing of Mr. Nelson's hearing loss in his right ear on that date.
Dr. Bauman stated that on his first visit the plaintiff presented him with an audiogram performed by the Veterans Administration which satisfied him that Mr. Nelson needed a hearing aid.
Dr. Bauman stated that he did an audiogram in November of 1994 which revealed, based on an unexplained calculation he had made, that the plaintiff had an approximately 7.5% hearing loss in his right ear. Dr. Bauman described this condition as permanent.
Dr. Bauman offered no explanation of why the plaintiff's hearing loss in his right ear went from 9.3% in October of 1989 to 31% sometime in 1993, and then apparently improved to a 7.5% hearing loss in November of 1994. Dr. Bauman offered no explanation of what the normal hearing loss would be in a 50 year-old male.
Dr. Bauman stated Mr. Nelson has tinnitus and hyperacusis.
Dr. Bauman did not ever treat or interview Mr. Nelson prior to September 15, 1993. It was impossible for him to evaluate what Mr. Nelson's condition of tinnitus and hyperacusis was prior to that date and more importantly, prior to September 4, 1991.
Mr. Nelson confirmed upon cross examination that he had made a claim to the Veterans Administration for disability benefits. In his deposition taken on October 6, 1995, Mr. Nelson was asked whether he had made any disability claims. (Defendant's Exhibit No. 11.) His answer was "I don't recall that, doing that, no."
There are other possible causes of Mr. Nelson's hearing CT Page 251 damage. The reports of Dr. Wang, an ear, nose and throat physician, that were marked as Plaintiff's Exhibit H confirm that Mr. Nelson suffers from injuries to his right ear that were not caused by CLP. Although Dr. Wang was the first doctor who Mr. Nelson treated with following the incident of September 4, 1991, Mr. Nelson saw Dr. Wang for the first time on March 12, 1993, over 18 months after the incident referred to in the plaintiff's complaint.
Dr. Wang's report of June 10, 1993 confirms that Mr. Nelson consulted with Dr. Wang "because of a 20-year history of bilateral tinnitus." There is no mention in Dr. Wang's report of any damage or complaints of damage related to a fuse or a fused cut out device.
The only reports or notes that reference a fuse or a fused cut out device were created by Dr. Bauman who did not treat the plaintiff until after this lawsuit was filed.
The court has carefully studied the fuse cut out device (Defendant's Exhibit 1) in order to understand its function and purpose and to relate the testimony to the exhibit.
The plaintiff has failed to establish by a fair preponderance of the evidence that the operation of the fuse cut out device was the proximate cause of the plaintiff's hearing deficit.
There are several possible causes of plaintiff's hearing problems including the fireworks explosion and the firing of military weapons while in the service.
In addition, there was no prompt resort to secure medical assistance, treatment or evaluation after the events of September 4, 1991. The relatively long lapse in seeking medical help or opinion allows the inference that plaintiff's condition may be merely the progression of hearing problems generated by sources separate and distinct from the events of September 4, 1991.
The defendant has not been shown to be negligent.
On the basis of the testimony and the exhibits, it cannot be said that the operation of the fuse cut out device on CLP Pole No. 208 on September 4, 1991 was the proximate cause of CT Page 252 the plaintiff's hearing deficit.
Judgment may enter in favor of the defendant Connecticut Light Power Company.
Austin, J.